

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Parkcentral Global Hub Limited, | |
| Plaintiff, | **No.**_____ |
| -against- | **(Jury Trial Demanded)** |
| Porsche Automobil Holdings SE, f/k/a/ Dr. Ing. h.c. F. Porsche AG; | **COMPLAINT** |
| Defendant. | |

Plaintiff Parkcentral Global Hub Limited (hereafter "Parkcentral" or "Plaintiff"), by and through its undersigned counsel, brings this action alleging fraud and violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The following allegations are based on Plaintiff's personal knowledge as to itself and its own acts and are otherwise based on information and belief supported by its counsel's investigation. Plaintiff's counsel's investigation has included, among other things, a review of press releases, financial disclosures, and public statements made by Volkswagen AG ("VW"), Porsche Automobil Holding SE, f/k/a/ Dr. Ing. h.c. F. Porsche AG ("Porsche"), Wendelin Wiedeking ("Wiedeking"), Holger P. Haerter ("Haerter,"); security analysts' reports; news and financial press reports; and other sources and data detailed below. Plaintiff believes that a reasonable opportunity for discovery will likely reveal substantial additional evidentiary support for the allegations set forth below.

## NATURE OF THE ACTION

1.      This is an action for the recovery of at least $90 million in damages that Parkcentral lost as the direct result of Porsche's illegal scheme to secretly take over VW by

cornering the market for VW's ordinary/voting shares ("VW Shares") through fraud and market manipulation, a scheme that caused what the *New York Times* has called "a short squeeze of historic proportions." This massive fraud caused legitimate investors, including Parkcentral, to lose an estimated $38.1 billion in less than one week of trading in late October 2008. During that exact same week, Porsche cleared over $7.6 billion in trading profits.

2.      During the period of Porsche's scheme, Porsche was the largest shareholder of VW Shares, publicly stating that it owned more than 30% of the VW Shares by April 2007. The second largest shareholder was the German region of Lower Saxony, which for political reasons held slightly more than 20% of the VW Shares.

3.      Based on analysis of VW's profitability and operations, Parkcentral believed that the value of the VW Shares was increasingly overvalued relative to VW's preferred stock and equity value as an enterprise. Parkcentral therefore established the economic equivalent of a short position in VW Shares. Instead of actually taking a short position in the VW Shares (which would generally mean that Parkcentral borrowed VW Shares and sold them, undertaking an obligation to repurchase the VW Shares and return them at a future date), Parkcentral instead entered the short side of security-based swaps on VW Shares. From an economic perspective, these swap transactions functioned virtually the same as if Parkcentral had actually taken a short position in VW Shares.[1] Parkcentral's swap transactions were entered into, terminated, and based entirely in the United States, with Deutsche Bank in New York acting as the counterparty.

4.      Parkcentral's evaluation that VW shares were overvalued was bolstered and reliant upon Porsche's repeated public assurances between at least March 2008 through October

---

[1] The plain text of Section 10 of the Securities Exchange Act of 1934 states that it and any rules promulgated under it apply to security-based swap agreements to the same extent that they apply to securities. *See* 15 U.S.C. § 78(j).

2008 that it did not currently own, and did not intend to acquire, a controlling interest in VW, meaning at least 75% of the VW Shares. Parkcentral realized that if Porsche were to ever attempt to take control of VW by purchasing the remainder of the available VW Shares in the market, the ability to repurchase VW Shares to cover short positions would be seriously impaired, if not destroyed.[2] Unlike the potential liability on buying shares in a corporation, which is limited to the price paid for the shares, the downside risk on a short position is, at least in theory, infinite because the share price could rise to any level a buyer is willing to pay. Therefore, in entering into and maintaining its short side security-based swap transactions on VW Shares, Parkcentral directly relied on the Defendant's express denial that Porsche would attempt to acquire control of VW. Parkcentral also relied on the market to provide an honest price on VW Shares, and believed that the natural interplay of supply and demand was determining the then-current prices of VW Shares.

5.      However, unbeknownst to both Parkcentral and the market at large, Porsche was clandestinely cornering the market in VW Shares as part of an effort to secretly take control of VW. Through careful market manipulation, Porsche convinced investors to believe that the VW Shares were overvalued, inducing them to enter into short sales of VW Shares. These short sales in turn allowed Porsche to acquire more and more VW Shares, since unbeknownst to the short sellers, Porsche was directly and indirectly acquiring the borrowed VW Shares that the short sellers were selling in the market as part of its secret scheme to take over VW. Because Parkcentral, other VW short sellers, and the market were unaware that Porsche had a secret

---

[2] Because Parkcentral was entering the short side of security-based swaps as opposed to actually taking short positions in VW Shares, Parkcentral would not itself be required to physically purchase VW Shares to cover its positions. From an economic perspective, however, this had no bearing on Parkcentral's analysis because Parkcentral would be obligated to pay its counterparty (Deutsche Bank) the same amount of money as if it were purchasing the VW Shares itself.

scheme to take control of VW by acquiring more than 75% of the VW Shares, and based upon
Parkcentral's reliance on both Porsche's express statements and the integrity of the market,
Parkcentral believed that there would be VW Shares available in the market to cover short
positions, thus avoiding any risk of a short squeeze and artificial price inflation. In fact,
Porsche's fraud and manipulation had skewed both the supply and demand for the VW Shares,
and consequently both Parkcentral and the market as a whole vastly overestimated the supply of
VW Shares outside of Porsche's control.

6.     On October 26, 2008, Porsche sprung its trap on the market and revealed its vast
and previously undisclosed holdings in VW Shares (including VW Shares controlled through
options-contract counterparties) and its plan to take over VW. Porsche revealed its control of
approximately 74% of outstanding VW Shares either directly or through options-contract
counterparties. VW short sellers realized that with Porsche locking up so much of the float, there
would not be nearly enough VW Shares available to meet the demand from short sellers needing
to cover their positions. Thus, the disclosure created "a massive short squeeze" (Reuters) as
short sellers scrambled to cover their positions, causing the price of VW Shares to skyrocket.
The panic did not subside until Porsche, under significant pressure, eased its stranglehold on
supply by selling VW Shares and/or settling options on VW Shares, and in the process extracting
billions of dollars in profits from the short sellers who were at its mercy. Because of its
extensive and previously undisclosed holdings of VW Shares, Porsche made enormous profits
from its fraudulent scheme at the expense of short sellers, including Parkcentral, who lost
colossal sums of money covering their short positions.

## PARTIES

### A.   The Plaintiff

6.     Plaintiff Parkcentral is a limited liability company established under the laws of Bermuda, with its registered address at Crown House, 4 Par-la-Ville Road, Hamilton HM8, Bermuda.  At all relevant times, Parkcentral Capital Management in Plano, Texas provided services to Parkcentral, and personnel at Parkcentral Capital Management had authority over Parkcentral's VW related investments.  On November 27, 2008, Parkcentral filed for liquidation in Bermuda, and the Bermuda Supreme Court appointed Charles Thresh and Michael Morrison as Joint Provisional Liquidators ("JPLs").  On April 28, 2010 by order of the Bermuda Supreme Court the JPLs became Joint Liquidators.  The Joint Liquidators are charged with collecting and securing the assets of Parkcentral for their distribution to Parkcentral's creditors in the liquidation proceeding pursuant to Bermuda law.  The Joint Liquidators also have the exclusive authority to manage the affairs of Parkcentral.

### B.   The Defendant

7.     Defendant Porsche Automobil Holdings SE ("Porsche") became a European stock corporation (Societas Europaea) on November 13, 2007.  Prior to that time, it was known as Dr. Ing. h.c. F. Porsche Aktiengesellschaft. It is headquartered in Stuttgart – Zuffenhausen, Germany.  At all relevant times, Porsche was the largest shareholder in VW.

## JURISDICTION

### A.   Subject-Matter Jurisdiction

8.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and under § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because Plaintiff's claims arise under § 10(b) and § 20(a) of the Exchange Act.

9.     This Court has supplemental jurisdiction over Plaintiffs' state-law fraud claims

pursuant to 28 U.S.C. § 1367.

**B.      Personal Jurisdiction**

10.     This Court has personal jurisdiction over Porsche pursuant to Fed. R. Civ. P.

4(k)(1) because the Defendant is subject to the jurisdiction of the state of New York pursuant to

CPLR §§ 301 and 302(a)(3).  Alternatively, this Court has personal jurisdiction over Porsche

pursuant to Fed. R. Civ. P. 4(k)(2), which extends personal jurisdiction to the limits of the Fifth

Amendment's Due Process Clause.

11.     This Court also has personal jurisdiction over Porsche under § 27 of the Exchange

Act, 15 U.S.C. § 78aa, which extends personal jurisdiction to the limits of the Fifth

Amendment's Due Process Clause.

**1.      New York CPLR § 301 – General jurisdiction**

12.     Section 301 of New York's CPLR grants state courts personal jurisdiction over

any person physically present within the state, or over a person or entity "doing business" in the

state.  If a subsidiary is subject to general jurisdiction in New York, its parent is also subject to

general jurisdiction in New York where the activities of the parent show a disregard for the

separate corporate existence of the subsidiary.  Porsche Cars North America, Inc. ("PCNA") is a

Delaware Corporation currently registered to do business in New York.[3]  According to Porsche's

website, PCNA "is a wholly owned, indirect subsidiary of Dr. Ing. h.c. F. Porsche AG...."[4]  The

structure and culture of the Porsche corporate family renders PCNA a mere department and agent

of Porsche.  PCNA "provide[s] Porsche vehicles, parts, service, marketing and training for its

202 dealers," and  has exclusive right to import Porsche manufactured vehicles for sale in the

---

[3] *See* New York State Corporation/Business Entity Database: http://www.dos.state.ny.us/

[4] *See* http://www.porsche.com/usa/aboutporsche/porschecarsnorthamerica/n432/

U.S.[5]  Porsche appoints the senior managers of PCNA, who rotate throughout other divisions of

the corporate family.  *See* Porsche press release, *Detlev von Platen becomes new President and*

*CEO of Porsche Cars North America,* February 22, 2008. ("Dr. Ing. h.c. F. Porsche AG,

Stuttgart, Germany, names two new executive managers in its two most important markets.").[6]

As such, Porsche is subject to personal jurisdiction in New York under CPLR § 301 and, by

extension, under Fed. R. Civ. P. 4(k)(1).  Multiple members of the executive and supervisory

boards of Porsche have served on the boards of the regional subsidiaries since at least 2004,

according to published annual reports.  Wendelin Wiedeking, Chief Executive Officer of Porsche

at all relevant times, is listed as Chairman of PCNA from 2004 – 2007 and a member of the

PCNA board from 2004 through July 2009.  Holger Haerter, Chief Financial Officer of Porsche

at all relevant times, served as a member of the PCNA board over the same period.

    2.    **New York CPLR § 302(a)(3)**

    13.    Under § 302(a)(3) of New York's long arm statue, a New York court may

exercise jurisdiction over a non-domiciliary when he commits a tortious act outside of New York

if the situs of the injury from that tortious act is located within the state.  Porsche transmitted

fraudulent statements into New York, and Parkcentral entered, maintained, and terminated its

short positions in New York.  Parkcentral transacted its security-based swaps on VW Shares

entirely through Deutsche Bank, located at 60 Wall Street, New York, NY 10005. When the

disclosure of Porsche's fraud and manipulation were disclosed on October 26, 2008 and the short

squeeze detonated, New York served as the location where Deutsche Bank calculated and issued

demands to Parkcentral for termination values with respect to Parkcentral's VW transactions.  As

---

[5]  *Id.*

[6]http://www.porsche.com/usa/aboutporsche/pressreleases/pag/archive2008/quarter1/?pool
=international-de&id=2008-02-22

such, New York is the location where Porsche's tortious actions had their first effect on Parkcentral.

14.     Porsche knew or should have known that its tortious behavior would have consequences in the state of New York. Defendant was well aware that New York City functions as one of the main locations for trading activities, including trading in security-based swaps, and that a number of investment management firms and banks are either based in New York City or maintain substantial offices in New York City. In fact, representatives of Porsche regularly spoke by telephone to investment management firms that it knew were located in New York City regarding its acquisition of VW Shares, and also directed emails and other communications to those same offices. And, there can be no doubt that Porsche derives substantial revenue from interstate or international commerce. From 2007 through 2008, Porsche sold more than 98,000 vehicles throughout the world and reported total earnings of more than $8.6 billion. As discussed in more detail below, Porsche also engaged in a persistent course of conduct in New York through their regular and persistent communications with investors and investment management firms located in New York. As a result, New York courts have personal jurisdiction over Porsche under CPLR § 302(a)(3), and, by extension, this Court has jurisdiction under Fed. R. Civ. P. 4(k)(1).

### 3.     Porsche's Contacts with New York State and the United States

15.     The following facts demonstrate that Porsche had sufficient minimum contacts with the United States to render it amenable to this suit and fulfill the Due Process requirements of both the 5th and 14th Amendments. In connection with the acts and conduct alleged in this Complaint, the Defendant, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications.

16.     As more fully described in this Complaint, the Defendant's acts and conduct occurred in New York and the United States, including the making of material false statements and omissions in the United States that were directed at investors and investment managers in New York and the United States.  These acts and conduct had substantial, direct and foreseeable effects on Plaintiff and other persons in New York and the United States.

17.     Porsche launched its effort to corner the market in VW stock by purchasing a large block of VW Shares in the United States from Brandes Investment Partners LLC, an American institutional investor in San Diego, California.

18.     Porsche maintained regular and substantial contacts and communications with New York and the United States, including regularly distributed press releases, ad hoc announcements, and other significant company news or documents by electronic mail, in English, to an undisclosed distribution list which, at relevant times, included at least 30 recipients in the United States.  The U.S. recipients included hedge funds, investment funds, and pension funds.

19.     Over the course of 2007 and 2008, Porsche purposefully transmitted numerous public announcements, press releases, and other reports regarding Porsche's acquisition of VW Shares to New York and the United States using the means and instrumentalities of interstate commerce, including, but not limited to, interstate wire and telephone communications.

20.     The following are examples of email communications that Porsche is believed to have sent into New York and the United States:

a.     On November 14, 2006, Sylvia Stadelmann ("Stadelmann") of Porsche emailed an invitation to Porsche's analyst conference in Stuttgart.

9

b.     On March 5, 2007, Stadelmann emailed the Porsche Group Shareholders' Letter, which discussed Porsche's investment in VW.

c.     On March 24, 2007, Gaube emailed an announcement of the decision by the Supervisory Board of Porsche to authorize an increase in Porsche's stake in VW from 27.3% to up to 31% and disclosed that Porsche held an option to purchase up to 3.7% of VW's Shares.

d.     On April 30, 2007, Gaube emailed a notice that Porsche had just published a mandatory offer for VW Shares on its website and a link directing recipients of the email to Porsche's offer.

e.     On May 4, 2007, Gaube emailed an invitation to Porsche's extraordinary general meeting.

f.     On May 7, 2007, Gaube emailed a notice that Porsche had just published the results of the first week of Porsche's mandatory offer for VW Shares.

g.     On May 30, 2007 Gaube emailed a notice of the expiration of Porsche's mandatory offer for VW Shares.

h.     On June 4, 2007, Gaube emailed a press release announcing the results of Porsche's mandatory offer for VW Shares.

i.     On June 26, 2007, Gaube emailed a press release discussing Porsche's investment in VW.

j.     On October 23, 2007, Stadelmann emailed a Porsche press release discussing a decision by the European Court of Justice regarding the VW Law.

k.     On December 14, 2007, Gaube emailed Porsche's interim financial information, which contained a discussion of Porsche's "strategic/industrial" partnership with VW.

l.      On March 3, 2008, Katharina Dippell ("Dippell") of Porsche emailed a press release announcing the decision of the Supervisory Board of Porsche to authorize the increase of Porsche's stake in VW to more than 50%.

m.      On March 10, 2008 Dippell emailed a press release in which Porsche stated that it would not seek to raise its stake in VW to 75%.

n.      On March 14, 2008 Dippell emailed a press release in which Porsche said it would seek to amend VW's articles of association to reflect the judgment of the European Court of Justice regarding the VW Law.

o.      On March 19, 2008, Dippell emailed Porsche's Half-Year financial report, dated March 4, 2008, which discussed Porsche's investments in VW, the VW Law, and Porsche's intentions going forward, stating that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to create one of the world's most innovative and efficient automotive alliances...."

p.      On April 18, 2008, Dippell emailed an English translation of an interview, published in the April 17, 2008 edition of Stern Magazine, of Wolfgang Porsche and Ferdinand Piëch, members of the two families that control much of Porsche and VW, in which they discussed Porsche's investment in VW.

q.      On June 18, 2008, Stadelmann emailed Porsche's interim financial information, which discussed Porsche's investment in VW, the VW Law, Porsche's intention to acquire the "majority of voting rights" in VW, and Porsche's intent to create "one of the world's most innovative and efficient automotive alliances...."

r.      On October 27, 2008, Gaube emailed the October 26, 2008 press release in which Porsche finally revealed its intention to acquire 75% of VW Shares and to seek a

"domination agreement" with VW, which under German law would allow Porsche to exercise outright control over VW and its profits.  This announcement lead to the short squeeze in VW Shares.

21.     Porsche also distributed information regarding its investments in VW Shares by telephone with investors and investment managers in the United States.  These included conversations with similarly situated investment funds that have filed suit in the related case *Elliot Associates, L.P. v. Porsche Automobil Holdings SE*, Case No. 10 Civ. 0532 (HB) ("*Elliot Associates L.P., et al.*"), as follows:

a.     On May 5, 2008, Gaube spoke by telephone to Keith Goodman, an analyst at Glenhill Capital Management LLC in New York, NY, who was in New York and was responsible for advising certain plaintiffs in *Elliot Associates L.P., et al.* regarding their investment decisions in VW.  Gaube knew that Goodman was in New York at the time of the phone call.   During that telephone call, Gaube told Goodman that Porsche wanted to attain more than 50% ownership in VW and that in furtherance of that objective, it had used options to lock up an additional 20% of the VW Shares in addition to the approximately 31% of the Shares that it already owned outright.  Gaube also told Goodman that Porsche had no intention of increasing its stake in VW to 75%.

b.     On October 20, 2008, Gaube spoke by telephone with David Einhorn, President of Greenlight Capital, Inc. in New York, NY, who was in New York and had final authority to make trading decisions for certain plaintiffs in *Elliot Associates L.P., et al.*. regarding their investment decisions in VW.  Gaube knew that Einhorn was in New York at the time of the phone call.  During that telephone call, Gaube told Einhorn that Porsche was not going to 75%, that "going to 75% is not on the agenda," and specifically denied controlling

12

almost all the float of VW Shares.  Gaube also expressly disavowed the speculation of one

analyst, Max Warburton of Alliance Bernstein, who, on October 17, 2008, had offered in the

form of a Bernstein Research analyst report a seemingly speculative argument that Porsche

might be accumulating additional control of VW Shares.  Gaube claimed to have "talked to a

number of investors and analysts" to refute Warburton's theory, which Gaube called "complete

bull****."

        c.      On or about October 20, 2008, Gaube spoke by telephone with Neeraj

Chandra, an analyst at Tiger Global Management, LLC in New York, New York, who was in

New York and was responsible for advising certain plaintiffs in *Elliot Associates L.P., et al.*

regarding their investment decisions in VW.  Gaube knew that Chandra was in New York at the

time of the phone call.  During that telephone call, Gaube told Chandra that Porsche had options

that would allow it to raise its stake in VW Shares to 50-55%, but told Chandra that the

accumulation would stop there.

        d.      On or about October 20, 2008, Gaube spoke by telephone with Larry

Robbins, Chief Executive Officer of Glenview Capital Management, LLC in New York, NY

who was in New York and had final authority to make trading decisions for certain plaintiffs in

*Elliot Associates L.P., et al.* regarding their investment decisions in VW.  Gaube knew that

Robbins was in New York at the time of the phone call.  During that telephone call, Gaube told

Robbins that Porsche did not intend to go much above 51% ownership in VW and did not intend

to go to 75%.

        22.      Porsche also made other false and misleading statements related to its VW

investments while they were in the United States:

a.      On October 12, 2005, Porsche's Chief Financial Officer Holger P. Haerter ("Haerter") spoke on Porsche's behalf at the St. Regis Hotel in New York with American investors about Porsche's investment in VW.  Porsche's American meeting was part of a road show about which the *Financial Times* reported on October 2, 2005: "Conscious of the market's skepticism, Porsche will from this week meet UK and US investors to try to convince them of the merits of its plan."

b.      On January 9, 2007, Dr. Wendelin Wiedeking ("Wiedeking"), Chief Executive Officer of Porsche SE,  met with reporters at the North American International Auto Show in Detroit.  Of the sixty-nine questions posed to Wiedeking during the hour-long group interview, sixty-four were related to VW.  At that same auto show in Detroit, Wiedeking participated in an interview with *Business Week's* David Kiley in which Kiley asked Wiedeking why Porsche was not paying a premium for control of VW.  Wiedeking responded, "Why should I pay a premium?  No.  I don't see any reason for this, 29% is enough for Porsche.  We won't acquire more than 50%."[7]

23.     Porsche maintained an English language website with an archive of English language press releases at all relevant times, which it used to target its misrepresentations at investors in the United States.  While Porsche did not translate all of its press releases into English, it did translate each of them that related to Porsche's intentions and holdings with respect to VW Shares.  Furthermore, U.S. investors that visit Porsche's U.S. website,

---

[7]  *Porsche and VW: Forward Together*, Businessweek.com, January 10, 2007 (http://www.businessweek.com/autos/content/jan2007/bw20070110_159650.htm).

14

www.porsche.com, in search of investor relations information were directed to the English

language section of Porsche SE's website, www.porsche-se.com.[8]

24.   Porsche also conducts substantial business in the United States, which is the

largest market for its automobiles, through its subsidiaries, which include Porsche Cars North

America, Inc., Porsche Liquidity LLC, Porsche Capital LLC , and Porsche Enterprises Inc., all of

which are Delaware corporations 100% owned by Porsche through an "indirect equity

investment" and fully consolidated into Porsche financial results. In addition, Porsche Financial

Services, Inc., based in Lisle, Illinois, is a wholly-owned subsidiary of Porsche Enterprises, Inc.,

and therefore also a wholly-owned and consolidated subsidiary of the parent corporation.

Porsche's United States subsidiaries perform substantial business activity on its behalf that, were

it not for them, Porsche would perform itself.  Three of these United States subsidiaries alone

(Porsche Cars North America, Inc., Porsche Liquidity LLC, and Porsche Capital LLC) had sales

of over $1.5 billion  and employed 243 individuals in the United States at the conclusion of the

2008 fiscal year.[9]

25.   Porsche Cars North America is currently registered to do business as a foreign

corporation in the state of New York.  Porsche's control over its wholly-owned subsidiary,

PCNA, is sufficient to render PCNA the agent of the Defendant, and therefore PCNA's activities

in New York constitute minimum contacts with New York by the Defendant.

26.   Porsche is also aware that it is an international company subject to laws in

multiple jurisdictions.  On at least seven occasions, it has sought the protection of United States

laws in federal courts. *See, e.g. Dr. Ing. H.C.F. Porsche AG v. Universal Brass, Inc.,* 1995 WL

---

[8]   Redirection of the user to an English translation appears to be automatic, presumably
based upon the geographic location of the user as determined by IP address.

[9]   Sales and employment figures by region were not disclosed in the more recent
2008/2009 Porsche annual report.

420816 (W.D. Wash. 1995); *Dr. Ing. H.C.F. Porsche AG v. Classic Motor Carriages, Inc.*, 92

F.R.D. 781 (S.D.Fla. 1982); *Dr. Ing .H.C.F.Porsche AG v. Zim* 481 F.Supp. 1247 (N.D. Tex.

1979); *Porsche Cars North America, Inc. v. Porsche.net*, 302 F.3d 248 (4th Cir. 2002) (*Dr. Ing.*

*H.C.F. Porsche AG* is named co-plaintiff); *Porsche Cars North America Inc. v. AllPorsche.com*,

2000 WL 742185 (4th Cir. 2000) (*Dr. Ing. H.C.F. Porsche AG* is named co-plaintiff); *Porsche*

*Cars North America, Inc. v. Spencer*, 2000 WL 641209 (E.D.Cal. 2000) (*Dr. Ing. H.C.F.*

*Porsche AG* is named co-plaintiff); *Porsche Cars North America, Inc. v. Manny's Porshop, Inc.*,

972 F.Supp. 1128, 1129 (N.D.Ill. 1997) (*Dr. Ing. H.C.F. Porsche AG* is named co-plaintiff).

### 4.    Porsche's Wrongful Conduct Had Direct and Foreseeable Effects in New York and the United States

27.    In addition to acts and conduct of Porsche occurring in the United States, the

Defendant's wrongful conduct had a substantial, direct and foreseeable effect in the United States

and upon United States residents and domiciliaries, including investors in Parkcentral. During

the relevant period, dozens of U.S. institutional investors and funds owned millions of VW

Shares for the benefit of investors residing in the United States.

28.    Porsche was an experienced derivatives trader facing a mathematical problem: it

sought to obtain control of 75% of the VW Shares, but more than 25% of the VW Shares were

controlled by shareholders who would not or, effectively, could not sell their VW Shares to

Porsche. Porsche therefore needed short sellers to borrow VW Shares from current owners who

would not or could not sell their VW Shares themselves to increase the available supply of VW

Shares that Porsche could seek to control. The success of Porsche's fraudulent scheme was

therefore dependent upon parties selling VW Shares short, and they were well aware of the short

positions taken on VW Shares in the market, both directly and through associated security-based

swaps. Porsche's statement on October 26, 2008 that it had become "apparent that there are by

far more short positions in the market than expected..." was facetious at best. Porsche not only knew that investors had taken extensive short positions in VW Shares, but had helped facilitate those shorts positions knowing full well that the primary victims of its scheme would be the funds taking those short positions. Furthermore, Porsche's self-serving and purposefully false statement that its disclosure of its VW position "should give so called short sellers... the opportunity to settle their relevant positions without rush and without facing major risks" demonstrated its awareness that it had engineered a short squeeze in VW Shares.

29.    Porsche was aware that while VW Shares traded on European exchanges, according to VW's own 2004, 2005, and 2006 Annual Reports, U.S. investors held far more VW Shares than German institutional investors. According to VW's own 2007 Annual Report, foreign (non-German) institutional investors held 25.6 percent of VW Shares, compared to 6.2 percent held by German institutional investors. Porsche was also aware that VW had (and still has) two sponsored American Depository Receipt ("ADR") programs, representing ordinary and preference shares that are backed by J.P. Morgan and trade in the U.S. on the over-the-counter market.[10] Most, if not all, of the VW ADRs were and are held by American investors.

30.    Porsche knew that hedge funds and the managers who make their investment decisions are concentrated in a small number of locations, with the large majority of investment managers based in the United States, and particularly in New York, New York. Therefore, Porsche (1) needed to affect investment decisions made in New York and the United States to achieve their scheme; and (2) knew that New York and U.S. based investment managers would rely, in New York and in the U.S., on Porsche's fraudulent statements and omissions. The Defendant also knew that the same fraudulent statements and omissions would be disseminated

---

[10]    *See* http://www.sec.gov/answers/adrs.htm.

throughout and absorbed by the market at large, and that the funds that were advised by U.S. investment managers would be the primary victim of their fraud and manipulation.

31.     Parkcentral's investment decisions relating to its VW investments and the ultimate decision-making responsibility for those investments was vested in Parkcentral Capital Management, a U.S. based entity that managed Parkcentral's VW investments entirely within the United States. During the relevant period, Parkcentral also had a significant percentage of U.S. investors. Parkcentral had three direct investor funds, two of which were U.S. entities:

    a.     The first feeder fund was Parkcentral Global LP, a Delaware limited partnership.

    b.     The second feeder fund was Petrus Securities LP, a Texas limited partnership during the relevant period of 2008 that has since relocated to Delaware.

    c.     The third feeder fund was Parkcentral Global Fund Limited, a Bermudian entity that maintained a substantial percentage of U.S. investors, measured by both the number of investors and percentage of capital in the fund.

32.     Porsche also deliberately sought access to the American capital markets, and purposefully availed itself of the privilege of conducting activities in the American securities market through its sponsorship of an American Depositary Share ("ADS") program, which is backed by Citibank, N.A. and The Bank of New York Mellon. As part of the ADS program, Porsche voluntarily makes filings with the SEC and provides English-language versions of its financial disclosures. See 17 C.F.R. 240.12g3-2(b)(1)(iii). Porsche knew that United States investors would reasonably rely on this information. Most, if not all, of the Porsche ADSs were and are held by American investors.

## VENUE

33.     Venue is proper in this District pursuant to 28 U.S.C. 1391(d), because Porsche is

an alien.  Venue is also proper under 15 U.S.C. § 78aa.  Venue is also proper because two related

cases are pending in this District against Porsche based upon the same operative facts and

circumstances alleged here.  *See Elliot Associates, L.P. v. Porsche Automobil Holding SE,* Case

No. 10 Civ. 0532 (HB) (filed January 25, 2010); *Black Diamond Offshore Ltd. v. Porsche*

*Automobil Holding SE,* Case No. 10 Civ. 04155 (HB) (filed May 20, 2010).

## FACTUAL BACKGROUND

**A.      Porsche Enters the Market for VW**

**        1.      Porsche: The Hedge Fund that Makes Sports Cars on the Side**

34.     Porsche is well-known in financial circles to be an experienced and aggressive

investor in derivatives, particularly under the direction of its former Chief Executive Officer

Wiedeking and Chief Financial Officer Haerter. According to Porsche representatives, Haerter is

a specialist in the derivatives markets and in the mathematics of options and other derivatives.  In

2002, Haerter radically overhauled Porsche's treasury operations and began focusing his efforts

on using the capital markets to improve Porsche's profits.  By as early as 2003, financial

commentators and automotive industry insiders were referring to Porsche as a hedge fund that

makes sports cars on the side.  By the close of the fiscal year ending July 31, 2008, Porsche's

capital markets strategy was so successful that an astonishing 88% ($11.8 billion) of Porsche's

total profits of $13.4 billion were generated from trading derivatives, and only 12% ($1.6 billion)

from actually selling cars. The Defendant's profits from derivatives trading that year actually

exceeded its gross revenues from selling cars.  As part of its foray into the world of derivatives

trading, Porsche masterminded a complex scheme based on fraud and manipulation of the market

through which Porsche could attempt to take control of VW.  This scheme, which increased

Porsche's trading profits by over $7.6 billion in just one week, caused the massive short squeeze at issue in this action.

### 2.    Volkswagen: The Target

35.    VW, headquartered in Wolfsburg, Lower Saxony, Germany, and is one of the world's largest automobile manufacturers and the largest carmaker in Europe. It is fourteen times larger than Porsche as measured by revenues, and eighty times larger than Porsche as measured by number of vehicles sold in 2008/2009. In 2009, VW produced over 6.3 million vehicles, corresponding to roughly an 11% share of the world passenger car market.

36.    VW is a publicly traded company, which issued VW Shares and preferred shares. VW's stock trades primarily on the Frankfurt Stock Exchange, although it is also represented on international stock exchanges in Switzerland, Luxembourg, and the UK. VW sponsors two "unlisted American Depositary Receipts" programs in New York, representing ordinary and preference shares that trade in the United States on the over-the-counter market.

### 3.    Porsche's Early Acquisition of VW Shares

37.    Porsche began acquiring VW Shares in late September 2005, and by late September 2005 had already acquired a 10.26% voting stake in VW and expressed a desire to increase that stake to 20%. Porsche's stated reason for acquiring VW Shares was to lessen the possibility that VW would be subject to a hostile takeover, which, according to Porsche, could threaten business relationships between VW and Porsche. At the time, an early version of a German law known as the "VW Law" was in place that limited any one VW shareholder's voting rights to 20%, regardless of the number of VW Shares held. Speculation was widespread that the European Court of Justice would soon invalidate that version of the VW Law, thus sparking concerns of a potential hostile takeover of VW. The European Commission had already taken the position that the VW Law violated European Union Law, and Porsche believed that a

hostile takeover attempt might follow invalidation.  According to Porsche, its acquisition of 20% of the VW Shares was the "strategic answer to the risk," but in no case, Porsche said, would its stake "reach the level at which Porsche would have to make a public offer to take over VW," *i.e.* 30% under applicable German law.  In October 2005, Porsche purchased additional VW Shares from institutional investors (including Brandes Investment Partners LLC in San Diego) such that by the end of 2005, it held approximately 18.5% of the VW Shares.

38.     Because so many of VW's investors resided in the United States, Porsche wanted to "meet... US investors to try to convince them of the merits of its plan."  On October 12, 2005, Merrill Lynch, who was advising Porsche on the acquisition of VW Shares, sponsored a meeting in New York during which Porsche employees, including Haerter, met with investors to discuss Porsche's acquisition of VW Shares.

39.     Throughout 2006, the Defendant assured investors that Porsche had no intention to significantly increase its holdings of VW Shares.  On January 23, 2006, a Porsche representative stated, "We [Porsche] control 18.53 percent as well as an option for a further 3.4 percent[, but] there are currently no plans whatsoever of increasing the VW stake beyond this." On January 27, 2006, Haerter stated that while Porsche intended to exercise the options it held to buy additional VW Shares at some indeterminate date, it would not acquire more than the roughly 22% of VW Shares that it would hold after that exercise.

40.     On February 24, 2006, VW retired a portion of outstanding VW Shares, which increased Porsche's holdings to 21% of the VW Shares (or 25% if Porsche exercised its VW options).

41.     On November 13, 2006, Porsche exercised its options and purchased additional VW Shares, raising its stake from 21% to 27.3%.  Two days later, Porsche announced that it

21

would raise its stake to just below 30%, the threshold at which German law would require it to launch a full tender for VW Shares.

42.     Although Porsche continued to acquire additional VW Shares during 2007, Porsche continued to assure the market that it had no intention of taking more than a majority control of VW.  In January 2007, Wiedeking attended the North American Auto Show in Detroit and met with reporters.  Sixty-four of the sixty-nine questions posed to him during the hour-long group interview related to VW.  *Business Week* reported that during an interview between its correspondent and Wiedeking that took place at that show, Wiedeking discredited the idea that Porsche was seeking to obtain control of VW and stated, "29% is enough for Porsche.  We won't acquire more than 50%."

43.     On March 24, 2007, Porsche announced that it planned to increase its stake to up to 31% of the VW Shares, but again stated, "[w]e don't want a majority."  Porsche claimed that the reason for its further acquisition was that it expected the VW Law to be repealed entirely, and it wanted to prevent hedge funds from taking over and breaking up VW.  Wiedeking told the press, "If hedge funds were to break up Volkswagen and publicly list [the company's individual brands,] we would risk losing our most important partner.  We cannot let such a breakup happen. That's why we acted."  By March 28, 2007, through the purchase of VW Shares and the exercise of options, Porsche had acquired 30.9% of the VW Shares.  "We can now react even more quickly should hedge funds want to take a stake in VW," Wiedeking told a newspaper.

44.     Because Porsche had acquired more than a 30% stake in VW, German law required Porsche to submit a full tender bid on the remaining VW Shares.  Porsche made the mandatory bid at the lowest possible price – a price no rational investor would accept since it was below the then-prevailing market price – and publicly renounced any interest in taking over

VW outright.  VW's board determined that the offer was too low, and announced that it could

not recommend to shareholders that they accept Porsche's tender.

45.    As of December 31, 2007, Porsche was VW's largest shareholder with 31% of the

VW Shares.  The State of Lower Saxony held 20.1%.  VW reported that foreign institutional

investors held 26.5%, and German institutional investors held 6.2% of the remaining VW Shares.

Unbeknownst to the market or Parkcentral, a substantial portion of the VW Shares held by

foreign institutional investors were held to hedge secret option contracts that Porsche held on

VW Shares.

**B.    Porsche Conspires to Secretly Acquire a Controlling Share in VW through
       Fraudulent Statements and Market Manipulation**

46.    To understand the full story behind Porsche's fraud, it is necessary to go back to

at least February 2008, when, according to German press accounts that did not become public

until more than a year later, Porsche representatives held a secret meeting in Berlin with a high-

ranking officer of the State of Lower Saxony participating on behalf of Prime Minister Christian

Wulff.[11]  Lower Saxony owned slightly more than 20% of thfe VW Shares, which it would not

relinquish for political reasons.  At that meeting, Porsche disclosed its intention to implement a

"domination agreement" with VW.[12]  A domination agreement between an acquiring firm and a

target firm allows the acquiring firm to control the target firm's decisions.[13]  Typically, a

domination agreement requires the bidder to hold 75% of the voting shares of the target

---

[11]    *See Geheimprotokoll: Porsche wollte schon im Februar 2008 VW beherrsche*,
WirtschaftsWoche, May 8, 2010 (http://www.wiwo.de/unternehmen-maerkte/geheimprotokoll-
porsche-wollte-schon-im-februar-2008-vw-beherrschen-396598/).

[12]    While this is the first known time that Porsche disclosed its scheme to a third party,
Plaintiffs expect discovery to show that Porsche implemented its fraudulent scheme prior to
February 2008.

[13] *See* Thomas Stohlmeir, *German Public Takeover Law: Bilingual Edition with an
Introduction to the Law* 119-120 (2002).

company. Because of VW's articles and the then current version of the "VW Law," Porsche required 80% of VW's Shares to enter a domination agreement, 5% more than typically required. Even if Porsche could only acquire control of 75% of the VW Shares, however, it could still achieve domination if (1) it was able to strike a deal for domination with Lower Saxony, or (2) the European Court of Justice abolished the "VW Law" and lowered the requirement for domination from 80% to 75%, which Porsche expected to happen.[14]  Porsche therefore set out to secretly achieve control of 75% ownership of the VW Shares.

47.      Porsche hid its domination plan in two ways: (1) lying directly to the market and investors, and (2) manipulating the market by acquiring a substantial portion of Porsche's VW Shares through options contracts it entered into in 2007 and 2008.

**1.      Porsche's Outright Lies and Misleading Statements to the Market**

48.      Porsche repeatedly lied to the market in the months and days leading up to Porsche's October 26, 2008 surprise announcement.  Porsche consistently denied that it was seeking to take control over VW, or that it was even seeking to approach the minimum ownership requirement necessary to do so.  These statements were false, since from at least as early as February 2008, Porsche had decided to attempt to acquire a minimum of 75% of the VW

---

[14]  On October 23, 2007, the European Court of Justice had ruled that three provisions of the VW Law were incompatible with the free movement of capital assured under European law, included the special provision that a majority of 80 percent was required for resolution of the general meeting as opposed to the normal 75 percent.  Following that judgment, a dispute among various parties (including VW, Porsche, and the State of Lower Saxony) ensued as to how that judgment should be interpreted when making changes to the Articles of Association of VW.  The dispute centered on whether each of the three provisions was in and of itself incompatible with European law, or whether it was only the combination of the three that were incompatible and therefore the 80% requirement could be left in place as long as the other provisions were changed.  As Porsche reported in an April 24, 2008 press release translated into English and available on its website, as of the 2008 annual general meeting of VW the debate was still ongoing, with Porsche taking the position that the each individual provision in and of itself violated European law and that the 80% requirement for domination must be changed to 75%.

Shares.[15]  Indeed, unbeknownst to the market for reasons detailed below, by as early as mid-2008, Porsche had already achieved direct or indirect control of nearly 75% of the VW Shares through outright positions and call options.  After the short squeeze, Frank Gaube ("Gaube"), Porsche's head of investor relations, publicly admitted Porsche's intention to keep its domination intention secret, telling the *Wall Street Journal*, "We are a very small company buying into a very large company.  That is not something you can afford if everybody is able to read your strategy in the newspaper."[16]

      49.     Porsche's false and misleading statements include, but are not limited, to the following:

      a.     On March 3, 2008, Porsche issued a press release, translated into English, titled "Porsche Supervisory Board Gives Go-ahead for Majority Stake in VW."  Porsche stated: "As soon as the requisite clearances have been obtained, Porsche SE can acquire the majority of the shares in Volkswagen.  Dr. Wendelin Wiedeking, Chief Executive Officer of Porsche SE, said: 'Our aim is to create one of the strongest and most innovative automobile alliances in the world, which is able to measure up to the increased international competition.'  It is not planned to merge the two companies."[17]  Porsche directly transmitted an English-language translation of this communication to one or more investment managers working in New York offices.

      b.     On March 4, 2008, in its Half-Yearly Financial Report Porsche translated into English, as required under SEC rules for ADR issuers, published on its website and emailed

---

[15]  While it is clear from the reported meeting with Lower Saxony that Porsche had implemented its domination plan at least as early as February 2008, discovery will be necessary to determine the true start date of Porsche's fraud and market manipulation.

[16]  Mike Esterl and Gregory Zuckerman, *VW Shares to Be Probed After Porsche Disclosures*, Wall Street Journal, C1, October 30, 2008.

[17]  http://www.porsche-se.com/pho/en/press/newsarchive2008/?pool=pho&id=2008-03-03

into New York, Porsche announced that once "antitrust clearance has been given, Porsche SE will acquire the majority shareholding in Volkswagen, with a view to create one of the world's most innovative and efficient automotive alliances...."

   c.  On March 10, 2008, in a corporate statement titled "Porsche denies speculations about increasing its stake in VW to 75 percent," which Porsche translated into English and emailed into the United States, Porsche stated that it would not raise its stake in VW to 75% and that, due to Lower Saxony's 20 percent stake, "the probability of acquiring [75%] from the remaining freefloat is very small indeed."

   d.  On May 5, 2008, during a phone call with an investment manager in New York, Gaube stated that Porsche did not intend to increase its stake in VW to 75%.

   e.  On May 29, 2008, according to the complaint filed in *Elliot Associates L.P., et al.,* Porsche issued a corporate statement that "[d]uring the course of this year, [the Porsche] share [of VW] will be increased to over 50%.

   f.  On July 28, 2008, Haerter told the told German daily *Frankfurter Allgemeine Zeitung,* "We're determined to cross the 51% threshold this year."

   g.  According to a September 18, 2008 report in Reuters, headlined *Porsche: Domination Agreement with VW "Not Up for Debate",* earlier that same week Haerter had stated during a meeting with Lower Saxony political officials that reaching a domination agreement was "completely unrealistic" and "not up for debate."

   h.  On October 2, 2008, Wiedeking announced at the Paris Motor Show that it planned to increase its stake in VW to more than 50% before the end of the year. As to domination, Wiedeking stated, "We do not want to rule out this possibility at the end of the day, some point in the future," but for now, he continued, domination is a "purely theoretical

option."[18] This statement was false and misleading because Porsche had obtained the ability to achieve this "purely theoretical option."[19]

　　　　i.　　In an interview published in the October 5, 2008, edition of German periodical *Frankfurter Allgemeine Sonntagszeitung,* Wiedeking stated that reaching "75% percent is out of the question today, that's for sure."

　　　　j.　　On October 20, 2008, during a phone call with an investment manager in New York, Gaube stated that Porsche did not intend to increase its stake in VW to 75% and that Porsche did not control almost all the float of VW Shares. He also disavowed the speculation of one analyst that Porsche might be accumulating additional control of VW Shares as "complete bull****."

　　　　k.　　On October 20, 2008, during a phone call with an investment manager in New York, Gaube stated that Porsche would stop accumulating VW Shares above 50-55%.

　　　　l.　　On October 22, 2008, during a phone call with an investment manager in New York, Gaube stated that Porsche did not intend to increase its stake in VW too much beyond 51%, and did not intend to increase its stake in VW to 75%.

　　50.　　The foregoing statements were false and misleading because Porsche already had decided to take full control of VW, not acquire a mere majority, and through the exercise of options had the ability to acquire nearly 75% of the VW Shares.

　　51.　　In a May 2009 interview with German publication Welt Online, Ferdinand Piëch, chairman of VW's Supervisory Board, a member of Porsche's Supervisory Board throughout the relevant period, and a major shareholder of both Porsche and VW, acknowledged that Porsche

---

[18]　Reuters, *AUTOSHOW-Porsche keeps option for domination of VW*, October 2, 2008 (http://in.reuters.com/article/idINWEA173620081002)

[19]　Reuters, *AUTOSHOW-Porsche keeps option for domination of VW*, October 2, 2008 (http://in.reuters.com/article/idINWEA173620081002)

had decided to increase its stake in VW up to 75% by mid-year 2008.[20]  Whether this is the first

time that VW and Piëch learned of Porsche's secret plan remains to be determined in discovery,

but Piëch's admission demonstrates that Porsche lied repeatedly to the market regarding its plans

for VW Shares.

### 2.    Porsche's Manipulation of the Market Through the Secret Accumulation of VW Shares through Option Contracts

52.    In addition to its outright lies to the market, Porsche also hid its takeover plan

from the market by secretly acquiring much of its position in VW Shares through option

contracts that it entered into in 2007 and 2008, which Porsche later used to ambush the market.

53.    While Porsche's goal was to control 75% of the VW Shares, the Defendant faced

a mathematical problem: more than 25% of the VW Shares were controlled by shareholders who

would not or, effectively, could not sell their VW Shares to Porsche.  The State of Lower Saxony

controlled 20% of the VW Shares, and refused to sell any of those VW Shares for political

reasons.  There were also other investors, notably index funds, who were required to hold VW

Shares to track indices that included VW Shares.  Those investors owned more than 5% of the

VW Shares.  It was therefore not feasible for Porsche to acquire 75% of the VW Shares without

short sellers.  While certain institutional holders of VW Shares were not willing to sell their VW

Shares, they were willing to lend them to short sellers since they knew that the short sellers were

obligated to repurchase and return the VW Shares to them at a future date.  Porsche's scheme

could only succeed if short sellers did exactly that: borrowed VW Shares and sold them, thus

effectively increasing the supply of VW Shares available for purchase in the market so that

Porsche could acquire more than 75% of the VW Shares.

---

[20]  *See Demonstration of Power in Sardinia,* Welt Online, May 13, 2009.

54.     Porsche's scheme therefore depended upon short sellers to effectively increase the supply of VW Shares by borrowing Shares and then selling them to the market. The Defendant induced investors to borrow VW Shares and short them, which obligated the short sellers to repurchase the Shares and return them at a future date. At the same time, Porsche bought call options on VW Shares, which in effect gave Porsche the right, but not the obligation, to purchase VW Shares at a certain time for a certain "strike" price from the counterparties. When the price of VW Shares rose, the value of Porsche's call options also rose. To hedge their positions, Porsche's counterparties in the call options needed to purchase VW Shares. They therefore bought the VW Shares that the VW short sellers were selling short and held them as a hedge in case Porsche exercised its rights under its call options. Unbeknownst to the market and to the VW short sellers, the VW Shares that the short sellers had just sold short now sat ready for delivery to Porsche at its exercise.

55.     Two features of these option contracts made them manipulative. The first manipulative feature was that Porsche disguised physical option contracts, which require disclosure, as cash-settled options contracts that did not have the same disclosure requirements. The fact that the Defendant did not actually consider these option contracts cash-settled – and therefore should have disclosed them – is clear from its own statements. For example, in Porsche's October 26, 2008 surprise announcement, Porsche admitted that its options actually reflected part of its 74.1% control of the VW Shares. Further, to minimize any doubt as to whether the option contracts were cash-settled or reflected actual control, Porsche referred to the option contracts as only "so called" cash-settled options. Porsche used these option contracts to acquire control over VW Shares and not as a means to benefit in cash from a rise in the price of the Shares. Because Porsche had the ability and intent to convert these option contracts into

actual share ownership, either through explicit contractual rights or potential side agreements with its counterparties, it should have disclosed its option contracts under applicable law. Those disclosures, which Porsche did not make, would have alerted both the market and Parkcentral of Porsche's scheme to acquire additional VW Shares.

56.     The second manipulative feature of Porsche's option contracts was that Porsche methodically divided out the contracts to avoid counterparty disclosure requirements. Porsche understood that the counterparties to the option contracts would purchase VW Shares to hedge their positions in the option contracts. If any one of these counterparties acquired too high of a percentage of the VW Shares, that counterparty would be legally obligated to disclose its ownership of the hedging VW Shares. The counterparty's disclosure would alert the market that someone had entered into a large derivative position on VW Shares. The market would then be able to infer that a takeover of VW was in progress, and that someone (in all likelihood, Porsche) was attempting to acquire control of the VW Shares using option contracts with counterparties. This District has recently recognized the deceptive nature of intentional efforts to parcel out trades to evade the need for a counterparty to disclose shares it held as hedges.[21]

57.     Gaube admitted Porsche's strategy of dividing up its option contracts among numerous counterparties when he stated in a call with a New York investment manager that Porsche did not want to "put all eggs in one basket" because that made it "easier for [Porsche] to not be visible, not be too visible in the market." In the same conversation, Gaube denied that the

---

[21] See *CSX Corp. v. The Children's Investment Fund Mgmt., (UK) LLP,* 526 F. Supp. 2d 511 (S.D.N.Y.), *aff'd,* 292 Fed. Appx. 133 (2d Cir. 2008).

reason Porsche was dividing its options trades was concerns with counterparty risk, the only

other plausible explanation for spreading around option contracts among counterparties.[22]

**C.    Parkcentral and the Market Relied on Porsche's Fraudulent Statements and Misleading Acts**

58.    Parkcentral relied on Porsche's intentional misrepresentations and manipulative

acts in choosing to retain its position on the short side of security-based swaps on VW Shares,

and greatly affected  the price at which Parkcentral terminated those positions.

59.    Given the facts available to them from the market, Parkcentral's significant and

detailed analysis determined that the price of the VW Shares was too high, and Parkcentral

therefore entered and kept short positions on the Shares through security-based swaps.  What

Parkcentral was not aware of, however, was that its value assessment of the VW Shares was

based upon a market price that was built upon Porsche's fraud and manipulation.  VW Shares

were trading in the market at prices that did not reflect Porsche's concealed demand for

additional VW Shares and the risk of a massive short squeeze.

60.    Parkcentral relied on the market to provide an honest price on VW Shares, and

believed that the natural interplay of supply and demand was determining the then-current prices

of VW Shares when determining to maintain its short position on swaps of VW Shares.  In fact,

however, Porsche's fraud and manipulation had skewed both the supply and demand for the VW

Shares.  In actuality, the demand for the Shares was greater than market prices indicated, because

Porsche concealed its efforts to corner the market in the VW Shares.  At the same time, the

supply of VW Shares was less than market prices indicated, because Porsche's fraud and

manipulation hid the extent to which Porsche had cornered the market in the free float of the VW

---

[22] The New York investment manager believed that Gaube was referring only to option contracts through which Porsche would acquire 50% of the VW Shares, since Gaube expressly denied in that same conversation that Porsche was attempting 75% ownership.

Shares. Based on the information available to it, Parkcentral therefore believed that the price of

VW Shares was too high, but in reality Porsche's fraud and manipulation had the effect of

keeping the price of the VW Shares lower than it would have been had the truth been available to

the market that Porsche was attempting domination of VW. If the market had been aware that

Porsche intended to take control of VW, the market would have realized that actual demand for

the VW Shares was much higher than it appeared and that the risk in shorting VW Shares was

consequently much higher than it appeared. Parkcentral would not have maintained short side

positions in security-based swaps on VW Shares.

61.     In addition to reliance on the market to provide an honest price, Parkcentral also

directly relied on (1) Porsche's repeated false public statements and material omissions

regarding its intentions with regard to the ownership of VW Shares; and (2) the absence of any

disclosed accumulation of VW Shares in the market. For example, on September 19, 2008

Bloomberg reported that Porsche made a September 18, 2008 statement that "acquiring more

than a simple majority [of the VW Shares] is 'not under consideration.'" Porsche's issued

various other corporate statements and press releases that contained the same false information

and omissions, which were translated into English and emailed into the United States.

62.     In addition to their public statements, Porsche also made false statements directly

to investors and investment management firms. Those statements not only corroborate Porsche's

bad intent with respect to their false public statements and manipulative omissions, but they also

placed additional false information in the market place that distorted the market's ability to reach

an honest price.

63.     Porsche's false and misleading statements were material to a reasonable investor.

No reasonable investor would have maintained a short position in VW Shares (or, equivalently,

32

the short side of security-based swaps) had it known of Porsche's plan to acquire 75% of VW.
The Defendant's false and misleading statements were also material to Parkcentral. Parkcentral
at all relevant times took into account the statements that Porsche made about its plans with
respect to VW and its ownership of VW Shares. Parkcentral would have neither maintained its
short position in the short side of security-based swap transactions on VW Shares nor been
forced to terminate these positions at exorbitantly high prices had it known of Porsche's plans to
acquire 75% of VW.

64.     As a professional investor, Parkcentral was aware that if Porsche entered option
contracts for large amounts of VW Shares, the counterparties to those contracts would hedge the
contracts by purchasing VW Shares. If the option contracts required the counterparties to hold
more than a certain amount of VW Shares, the counterparty would be required to disclose its
holdings of those VW Shares. Parkcentral followed the market in this regard, and was aware that
no counterparties had disclosed large holdings of VW Shares. Parkcentral directly relied on this
lack of reported holdings of VW Shares by counterparties when it maintained its short positions
in security-based swaps on VW Shares, and was forced to terminate those positions at
exorbitantly high prices.

**D.      Porsche Initiates the Short Squeeze of Historic Proportions**

65.     As a result of Porsche's fraud and manipulation, by October 26, 2008 almost
nobody owned VW Shares except for Porsche, Lower Saxony, index-tracking funds that were
required to hold the VW Shares to mimic indices, and Porsche's counterparties that were holding
VW Shares to hedge the call options they sold to the Defendant. Porsche had tricked the market
(including Parkcentral) into believing that a large free float of VW Shares was available, when in
reality virtually no float existed. On October 26, 2008, the date Porsche initiated the short
squeeze by finally disclosing its secret holdings of VW Shares, the percentage of VW Shares that

had been sold short (or the "short interest"), was about 13%. Because Porsche had secretly

acquired control of 74.1% of the Shares and Lower Saxony held another 20% of the Shares, only

5.9% of the VW Shares remained available to short sellers to cover their obligations. Moreover,

investors that would not or could not sell their VW Shares, including index funds, held a

significant amount of the remaining 5.9%. In sum, when the market opened on October 27, 2008

after Porsche's surprise announcement, far less than a 5.9% free float was available to satisfy a

13% short interest in VW Shares. A massive short squeeze was inevitable.

66.     Porsche's decision to trigger the short squeeze in October 2008 was not

accidental. Porsche desperately needed the short squeeze, and the resulting spike in the price of

VW Shares, to remain solvent. The Defendant faced tremendous financial danger if the price of

VW Shares dropped below a certain point, and the price of VW Shares had been declining in the

week leading up to Porsche's announcement.

67.     To fully understand the danger that Porsche faced from a drop in the value of VW

Shares, it is necessary to understand that Porsche had acquired control over virtually the entire

free float of VW Shares by entering into call option contracts. Call options cost money, and

Porsche needed a means of financing its purchases. Porsche paid for its call options by selling

put options on the same underlying VW Shares. Put options obligated Porsche to pay its put

option counterparties the difference between the "strike" price of the put option and the actual

price of VW Shares if the put strike price was higher than the actual price of the Shares. In

general, if the price of VW Shares dropped below the put strike price, then Porsche had a

liability to its counterparties for that difference, and as the VW Shares fell, that liability

increased. In sum, Porsche sold put options – which obligated it to pay money if the price of

VW Shares declined – in exchange for call options by which Porsche accumulated control of

34

VW Shares if the price increased. A rising price on VW Shares increased the value of Porsche's call options (what counterparties owed Porsche) and reduced Porsche's liabilities on the value of its put options (what Porsche owed counterparties).

68.     This strategy worked only so long as the price of VW Shares continued to increase. From early 2008 through mid-October, the price of VW Shares rose and Porsche's plan worked smoothly. On March 3, 2008, VW Shares closed at just under $228. On August 8, 2008, VW Shares closed at just over $300. The average closing price of VW Shares from October 1, 2008 through October 17, 2008 (a Friday), was $437.

69.     But, on Monday, October 20, 2008, as the world's stock markets plummeted, Porsche's strategy began to fall apart. VW Shares closed at $368 that day, more than 22% below its close the previous Friday. By the end of that week, the closing price of VW Shares had fallen to just under $266, or 39% below the average closing price of $437 from October 1, 2008 through October 17, 2008. Porsche's increasing liability on its put options threatened to overwhelm the falling value of Porsche's call options. If the prices of VW Shares continued to drop, Porsche's solvency was in jeopardy.

70.     On October 26, 2008, a Sunday, in a press release titled "Porsche Heads for Domination Agreement," Porsche revealed its true control of VW Shares: "[a]t the end of last week, Porsche SE held 42.6 percent of the Volkswagen ordinary shares and in addition 31.5 percent in so called cash settled options relating to Volkswagen ordinary shares to hedge against price risks, representing a total of 74.1 percent." This was the first time that the Porsche had ever disclosed the true extent of its holdings in VW Shares. Porsche's representation that it controlled 74.1% of the Shares confirms that Porsche and its counterparties viewed its option contracts as giving it control of the VW Shares underlying the options. Porsche further admitted

35

that it aimed "to increase to 75% in 2009, paving the way to a domination agreement."

Porsche's statement that its disclosure of its VW position "should give so called short sellers...

the opportunity to settle their relevant positions without rush and without facing major risks" was

inexplicable in light of what Porsche must have known would come when the markets opened

the next day.

71.     When markets opened on Monday, October 27, 2008, the day following Porsche's

announcement, as the *Wall Street Journal* put it, "all hell broke loose":

> When financial markets opened Monday, October 27, all hell
> broke loose. Funds that had borrowed VW shares and sold them,
> expecting no takeover offer and betting the stock would decline,
> raced to purchase shares to unwind the bets. There weren't enough
> to go around. Part of the reason is that underwriters of cash-settled
> options typically hedge their risk by owning the shares of the
> company involved. The shares they owned, combined with those
> Porsche had acquired, added up to 74.1%, and Lower Saxony state
> owned 20.1%. The result was that while some 12.8% of VW
> shares were on loan, mostly to short sellers, those that for practical
> purposes were in circulation amounted to only 6% of VW shares.
> As hedge funds fought for the remaining VW shares they drove the
> stock's price ever higher – deepening their losses. At the height of
> the short squeeze on Oct. 28, VW stock briefly topped 1,000
> Euros, nearly five times as high as on Oct. 24, making VW the
> biggest company by stock-market value for a few hours.

Mike Esterl and Edward Taylor, "As Giant Rivals Stall, Porsche Engineers a Financial

Windfall," *Wall Street Journal*, A1, November 8, 2008.

72.     On Monday, October 27, 2008, VW Shares opened at $437 per Share, up 66%

from the close on Friday, October 24, 2008. During the week of October 27-31, 2008, VW

Shares traded between a low of $406 (54% above the close on Friday, October 24, 2008) to a

high of $1,276 (477% above the close on Friday, October 28, 2008). For a time, VW was the

most valuable corporation on the planet by market capitalization. Parties that had sold VW

Shares short, or were on the short side of security-based swaps on VW Shares, were forced to cover their positions at prices that spiraled higher and higher.

73.    The following chart represents the closing price of VW Shares from March through November, 2008, dramatically demonstrating the effect the short squeeze had on the price of the Shares:



74.    At the height of the short squeeze, on October 29, 2008, Porsche agreed (albeit under substantial pressure) to release 5% of the VW Shares that it directly or indirectly controlled into the market, such that it could take advantage of the price parties were being forced to pay for the VW Shares but still maintain the bulk of its position in VW Shares for the takeover of VW.  Because of the outrageously high price of VW Shares at the time, Porsche earned billions of Euros for the Shares it released.  While "profiting" from its fraud and market

manipulation, a Porsche representative mocked Viking and other victims of its fraudulent scheme, saying, "A couple of gamblers on the market got their odds wrong. And now they are pointing a finger at us." Porsche also reduced its exposure to the put options it had sold.

75.    Around the same time, the German stock market index (DAX) reduced VW's weighting in its index thus allowing index funds to sell VW Shares so that some shorts were able to cover, but this was not before short sellers, and parties that had entered the short side of security-based swap transactions on VW Shares, lost an estimated $38.1 billion in less than a week and Porsche received a windfall of $7.6 billion.

76.    As of mid-October 2010, VW is trading at around $115. Now that VW Shares have fallen back to levels last seen in 2007, the short sellers instincts and assessment of the market were proven correct. It was too late, however, for most of them, including Parkcentral which was forced into bankruptcy less than one month following the short squeeze due to its loss of liquidity, including its direct loss of liquidity from the short squeeze itself. Losses were not limited to hedge funds alone. One of Germany's wealthiest men, Adolf Merckle, personally lost hundreds of millions of Euros on a short position and eventually committed suicide.

77.    Parkcentral itself no less than $90 million terminating its short positions in its security-based swaps between October 26, 2008 and November 28, 2008. The exorbitant price of terminating its short positions had a devastating effect on Parkcentral's overall liquidity, such that it was never able to recover and was forced to declare bankruptcy only one month later. Parkcentral's bankruptcy was a direct and consequential result of its lack of liquidity.

78.    After Porsche settled 5% of its position for mammoth profits, it utilized the cash to purchase more VW Shares and on January 5, 2009, officially became the parent entity of VW by virtue of its majority interest. Porsche, however, had pushed its finances to the breaking point

to attain this position, and even with the massive profits it "earned" through its fraudulent scheme amassed more than €10 billion in net debt. With VW's Share price falling, the credit markets frozen, and Porsche needing to roll over its short-term debt, VW extended Porsche an emergency loan and opened the door for a reverse takeover.

79.     German market regulators have been investigating Porsche's market manipulation, and Wiedeking and Haerter not only lost their positions at Porsche but are currently the subject of a massive insider trading criminal inquiry spearheaded by Frankfurt and Stuttgart prosecutors, and have had their homes and offices raided.

### THE REACH OF SECTION 10(b) OF THE EXCHANGE ACT

80.     The Supreme Court recently ruled in *Morrison v. National Australia Bank Ltd.,* 130 S. Ct. 2869 (2010) that Section 10(b) of the Exchange Act applies to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 2884. As *Morrison* makes clear, "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States."

81.     Each of Parkcentral's transactions was a securities based swap transaction entered into and terminated in the United States, and fall squarely within the "domestic transactions in other securities" category. Parkcentral's investment decisions with regard to VW shares were entirely managed by Parkcentral Capital Management acting from its offices in Plano, Texas. Deutsche Bank was the counterparty in all the VW shares transactions, and these transactions were conducted by its New York office. Parkcentral and its counterparty took all steps necessary to transact their swap agreements in the United States. As such, the relevant transactions were entirely domestic, and thus fall squarely within the coverage of the Exchange Act as interpreted in *Morrison.*

82.     Moreover, VW Shares are traded in the United States through Volkswagen's sponsored American Depositary Receipt ("ADR") facilities.  An ADR represents ownership in the shares of a non-U.S. company, and is issued by a U.S. depository bank.  An ADR can represent a fraction of a share, a single share, or multiple shares of the foreign stock, and generally tracks the price of the foreign stock in its home market, adjusted for the ratio of ADRs to foreign company shares.  An owner of an ADR has the right to obtain the foreign stock it represents.  At all relevant times, VW had (and still has) two sponsored ADR programs, representing ordinary and preference shares that are backed by J.P. Morgan and trade in the U.S. on the over-the-counter market.[23]  Transactions in VW's ADRs are "domestic transactions in other securities," and as such are covered by Section 10b of the Exchange Act pursuant to *Morrison. Id.*  Porsche's fraud and manipulation directly affected transactions in VW ADRs.[24]

## CAUSES OF ACTION

### COUNT I
### SECURITIES FRAUD BASED ON FALSE AND MISLEADING STATEMENTS IN VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5

83.     Plaintiff repeats and realleges each and every allegations set forth above as if set forth in full herein.

84.     Porsche carried out a plan, scheme and course of conduct which was intended and did (i) deceive Parkcentral and other investors, as alleged herein; and (ii) caused Parkcentral and

---

[23]  *See* http://www.sec.gov/answers/adrs.htm.

[24]  *But see, e.g. Cornwell v. Credit Suisse Group*, No. 08 3758, 2010 WL 3069597 (S.D.N.Y. July 27, 2010);  *Sglambo v. McKenzie*, No. 09 Civ. 10087, 2010 WL 3119349 (S.D.N.Y. Aug. 6, 2010);  *Cedeno v. Cedel Int'l Inv. Ltd*, No. 09 Civ. 9716, 2010 U.S. Dist. Lexis 88026 (S.D.N.Y. Aug. 24, 2010);  *In re Alstom SA Securities Litigation*, 2010 WL 3718863 (S.D.N.Y. Sept. 14, 2010).  The Second Circuit has not issued any decisions regarding the reach of federal securities laws under *Morrison.*

other investors to sell VW Shares (or enter into and maintain the short side of security-based swaps on VW Shares) from at least March 3, 2008 through October 24, 2008, and terminate VW security based swaps at artificially high prices from October 27, 2008 through at least November 28, 2008.

85.     In furtherance of this unlawful scheme, plan, and course of conduct Porsche took the actions set forth herein.

86.     Porsche (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the buyers and sellers of the VW Shares and security-based swaps on those Shares in violation of §10(b) of the Exchange Act and Rule 10b-5.

87.     Porsche is sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

88.     Porsche, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal their true intentions with respect to acquiring 75% of the VW Shares and the contracts they put in place to do so.

89.     Porsche employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to ensure Parkcentral from at least March 3, 2008 through October 24, 2008, that Porsche had no intention of acquiring 75% of the VW Share. This included Porsche making, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make their statements about Porsche's

41

intentions with respect to acquisition of VW's Shares not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the buyers and sellers of VW's Shares (or the buyers or sellers of VW security-based swaps), including Parkcentral, from at least March 3, 2008 through October 24, 2008.

90.    Porsche's false and misleading statements are alleged in paragraphs 48-51 above.

91.    The Defendant had actual knowledge of the misrepresentations and omissions of material facts alleged herein.

92.    Porsche made their material misrepresentations and/or omissions knowingly and for the purpose and effect of concealing their true intentions with respect to the acquisition of the VW Shares.

93.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, alleged above, the market price of VW Shares was artificially depressed from at least March 3, 2008 through October 24, 2008, and artificially inflated from October 27, 2008, through at least November 28, 2008.

94.    Porsche's misrepresentations and omissions caused Parkcentral's losses. The Defendant's fraud caused Parkcentral's losses because Parkcentral relied on the market for VW Shares being free of fraud when they conducted significant analysis and determined to maintain their short position of security-based swaps on VW Shares. Parkcentral, ignorant of the fact that the market price of the VW Shares was artificially depressed, relied directly or indirectly on both the false and misleading statements made by Porsche and contained herein, and/or upon the integrity of the market in which VW's Shares trade, and/or in the absence of material adverse information that was known to Porsche but not disclosed in public statements by Porsche from at

least March 3, 2008 through October 24, 2008.  Relying upon this information, Parkcentral

conducted significant analysis and determined to maintain their short position in  swaps of VW

Shares at prices lower than would have existed had all of the facts been made public, and

terminated short security-based swaps on VW Shares at artificially high prices from October 27,

2008, through at least November 28, 2008.

95.     At the time of Porsche's misrepresentations and omissions, Parkcentral was

ignorant of their falsity, and believed them to be true. Parkcentral was a professional investor and

at all relevant times it and its investment manager took into account statements that Porsche

made about its plans with respect to VW and its ownership of VW Shares.  Plaintiffs constantly

reviewed press reports and analyst reports regarding Porsche's holdings of VW Shares, and

considered those reports for their relevance to each of its investment decisions.  Had Parkcentral

known the truth regarding Porsche's true intentions with respect to the acquisition of VW Shares

or the true extent of Porsche's actual control of VW Shares, Parkcentral would not have

maintained its short position of security-based swaps on VW Shares, and would not have been

forced to cover these positions at hugely inflated prices .

96.     The market for VW Shares was, at all times, an efficient market that promptly

digested current information with respect to VW from publicly available sources and reflected

such information in the prices of VW Shares and associated security-based swaps.  VW's Shares

were traded on a number of markets, including Deutsche Bourse markets and in the United States

through VW's sponsored ADR facility.  VW Shares were included in major market indices

including the DAX. Security analysts followed VW and published research reports regarding

VW that were publicly available to investors.  The market price of VW Shares and associated

security-based swaps reacted promptly to the dissemination of public information regarding VW.

97.    As a result of the Porsche's misconduct alleged herein, the market for VW Shares and associated security-based swaps was artificially depressed from at least March 3, 2008 through October 24, 2008, and artificially inflated from October 27, 2008 through at least November 28, 2008.

98.    The "fraud-on-the-market" theory applies.  Parkcentral justifiably relied on the integrity of the market price for VW Shares and was substantially damaged as a direct and proximate result termination of the short side of security-based swaps on VW Shares at artificially high prices when the truth was disclosed.

99.    By virtue of the foregoing, Porsche has violated §10(b) of the Exchange Act and Rule 10b-5.

100.    As a direct and proximate result of Porsche's wrongful conduct, Parkcentral suffered damages in connection with its determination to maintain its position on the short side of security-based swaps on VW Shares from at least March 3, 2008 through October 26, 2008, and the subsequent termination of the short side of security-based swaps on VW Shares at artificially high prices from October 27, 2008, through at least November 28, 2008.

**COUNT II**
**MARKET MANIPULATION IN VIOLATION OF §10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-5**

101.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth in full herein.

102.    Porsche, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts from at least March 3, 2008 through October 24, 2008, that kept the price of VW's Shares lower than it would have been had all of the facts been made public, and then drove the price of VW's Shares to

artificially high levels on and after October 27, 2008, through at least November 28, 2008, resulting in a short squeeze.

103.    Porsche's manipulative acts caused Parkcentral's losses because Parkcentral relied on the market for VW Shares being free of manipulation.  Porsche's market manipulation induced Parkcentral to maintain its short position of security-based swaps on VW Shares from at least March 3, 2008 through October 24, 2008, at prices lower than would have otherwise existed if all of the facts regarding Porsche's intentions and holdings with respect to VW Shares had been made public.  Porsche's  market manipulation caused Parkcentral to terminate short security-based swaps on VW Shares at artificially high prices on and after October 27, 2008, through at least November 28, 2008.

104.    At the time of Porsche's manipulation, Parkcentral was ignorant of the Defendant's manipulative acts.  Had Parkcentral known the truth regarding Porsche's true intentions to take control of VW through the acquisition of 75% of the VW Shares, or had Parkcentral known that Porsche was secretly acquiring additional VW Shares through deceptive distribution of option contracts designed to evade the triggering of counterparty disclosure requirements, Parkcentral would not have been forced to terminate those positions at exorbitant prices.  Parkcentral is a professional investor, and at all relevant times it and its investment manager took into account statements that Porsche made about its plans with respect to VW and its ownership of VW Shares.

105.    The market for VW Shares was, at all times, an efficient market that promptly digested current information with respect to VW from publicly available sources and reflected such information in the prices of VW Shares and associated security-based swaps.  VW's Shares were traded on a number of markets, including Deutsche Bourse markets and in the United States

through Volkswagen's sponsored ADR facility. VW Shares were included in major market indices including the DAX. Security analysts followed VW and published research reports regarding VW that were publicly available to investors. The market price of VW Shares and associated security-based swaps reacted promptly to the dissemination of public information regarding VW.

106.   As a result of the Porsche's misconduct alleged herein, the market for VW Shares and associated security-based swaps was artificially depressed from at least March 3, 2008 through October 24, 2008, and artificially inflated from October 27, 2008 through at least November 28, 2008.

107.   The "fraud-on-the-market" theory applies. Parkcentral justifiably relied on the integrity of the market price for VW Shares and was substantially damaged as a direct and proximate result of its entry into the short side of security-based swaps on VW Shares at artificially depressed prices and termination of the short side of security-based swaps on VW Shares at artificially high prices when the truth was finally disclosed.

108.   Porsche had actual knowledge of the misrepresentations and omissions of material facts alleged herein, and intended to deceive Parkcentral and other investors and hide the extent of Porsche's control of additional VW Shares through deceptive distribution of option contracts designed to evade the triggering of counterparty disclosure requirements. Porsche engaged in their deceptive conduct knowingly and for the purpose and effect of concealing their true intentions with respect to the acquisition of VW Shares.

109.   Parkcentral's transactions in the relevant security-based swaps on VW Shares occurred entirely within the United States. As the Supreme Court recently ruled in *Morrison v. National Australia Bank Ltd.*, No. 08-1191 (U.S. June 24, 2010), a case that holds which

securities transactions are subject to claims under Section 10b of the Exchange Act, Section 10b applies to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 18. Parkcentral's transactions fall squarely within the "domestic transactions in other securities" category, since the transactions took place entirely within the United States, including both the entrance into and termination of the swap agreements.

110.    By virtue of the foregoing, Porsche has violated §10(b) of the Exchange Act and Rule 10b-5.

111.    As a direct and proximate result of Porsche's wrongful conduct, Parkcentral suffered damages in connection with its entry into the short side of security-based swaps on VW Shares from at least March 3, 2008 through October 26, 2008, and its subsequent termination of the short side of security-based swaps on VW Shares at artificially high prices from October 27, 2008, through at least November 28, 2008.

### COUNT III
### VIOLATIONS OF §20(a) OF THE EXCHANGE ACT

112.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth in full herein.

113.    Porsche controlled Wiedeking and Haerter and all of its other employees.

114.    As set forth above, Porsche violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

115.    As a direct and proximate result of Porsche's wrongful conduct, Parkcentral suffered damages in connection with its entry into the short side of security-based swaps on VW Shares from at least March 3, 2008 through October 26, 2008, and its subsequent termination of the short side of security-based swaps on VW Shares at artificially high prices from October 27, 2008, through at least November 28, 2008.

47

## COUNT IV
## COMMON-LAW FRAUD

116.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth in full herein.

117.    Porsche made material misrepresentations and material omissions of fact which were false and which it knew to be false.

118.    The Defendant made material misrepresentations and material omissions of fact for the purpose of inducing Parkcentral and other investors to rely upon them.

119.    Parkcentral justifiably and reasonably relied on the Porsche's material misrepresentations and material omissions of fact.

120.    Parkcentral was damaged in an amount to be proven at trial on account of its justifiable reliance on the Porsche's material misrepresentations and material omissions of fact.

### JURY TRIAL DEMAND

121.    Plaintiff hereby demands a jury trial for each of the counts alleged.

### PRAYER FOR RELIEF

122.    WHEREFORE, Plaintiff prays for relief and judgment in its favor, as follows:

    a.      On Count I damages in an amount to be proven at trial;

    b.      On Count II damages in an amount to be proven at trial;

    c.      On Count III damages in an amount to be proven at trial;

    d.      On Count IV damages in an amount to be proven at trial;

    e.      Plaintiff's reasonable costs and expenses incurred in this action, including fees for Plaintiff's attorneys and experts;

    f.      Prejudgment interest and/or opportunity cost damages in favor of Plaintiff; and

g.      Such other and further relief as this Court may deem just and proper.


DATED:   New York, New York
         October 22, 2010

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By: _____
    Marc L. Greenwald
    marcgreenwald@quinnemanuel.com
    Elinor C. Sutton
    elinorsutton@quinnemanuel.com

51 Madison Avenue, 22nd Floor, New York,
New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff*